# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 19, 2009        Decided May 29, 2009

No. 08-1150

CITY OF SOUTH BEND, IN AND BROTHERS OF HOLY CROSS, INC.,
PETITIONERS

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF AMERICA,
RESPONDENTS

CHICAGO, LAKE SHORE & SOUTH BEND RAILWAY,
INTERVENOR

———

Consolidated with 08-1301

———

On Petitions for Review of an Order
of the Surface Transportation Board

———

*Richard H. Streeter* argued the cause for petitioners. With him on the briefs were *Jeffrey M. Jankowski* and *Adrienne U. Wisenberg*.

*Virginia Strasser*, Attorney, Surface Transportation Board, argued the cause for respondent. With her on the brief

were *Deborah A. Garza*, Acting Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *John P. Fonte*, Attorneys, *Ellen D. Hanson*, General Counsel, Surface Transportation Board, and *Craig M. Keats*, Deputy General Counsel.

*John D. Heffner* argued the cause and filed the brief for intervenor.

Before: SENTELLE, *Chief Judge*, and GINSBURG and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

Concurring opinion filed by *Circuit Judge* KAVANAUGH, in which *Chief Judge* SENTELLE concurs as to Part I.

GINSBURG, *Circuit Judge*:  The City of South Bend and the Brothers of the Holy Cross petition for review of orders of the Surface Transportation Board (1) denying their application for adverse abandonment of two railroad lines in South Bend, Indiana, and (2) refusing to reopen the proceeding.  The petitioners argue the Board's orders were arbitrary and capricious under the Administrative Procedure Act.  We deny the petitions for review because in both instances the Board acted reasonably.

## I.  Background

The Congress has delegated to the Board exclusive jurisdiction to regulate "transportation by rail carriers" and "the construction, acquisition, operation, abandonment, or discontinuance" of rail facilities, *see* 49 U.S.C. § 10501(b), with the instruction that the agency "ensure the development and continuation of a sound rail transportation system," *id.* §

10101(4). A rail carrier may abandon a line upon its own petition or that of a third party with a "proper interest," *Modern Handcraft, Inc.*, 363 I.C.C. 969, 971 (1981) (adjacent landowner and transportation authority have standing), "only if the Board finds that the present or future public convenience and necessity require or permit the abandonment," 49 U.S.C. § 10903(d). Abandonment frees subservient landowners to exercise reversionary rights in, and local governments to condemn, the railroad's right-of-way. *See Hayfield N. R.R. Co. v. Chicago & N.W. Transp. Co.*, 467 U.S. 622, 633–34 (1984). Because reassembling a right-of-way may be difficult if not impractical, the Board must, before authorizing an abandonment, give weight to its "statutory duty to preserve and promote continued rail service." *N.Y. Cross Harbor R.R. v. STB*, 374 F.3d 1177, 1187 (D.C. Cir. 2004).

In 2006 the petitioners applied for adverse abandonment of two interconnected short branch rail lines that together run for 3.7 miles through South Bend. The current owner, Norfolk Southern Railway Company (NS), has neither maintained nor used either line. One line serves a coal-fired power plant on the campus of the University of Notre Dame, but the University stopped receiving coal by rail in the mid-1990s. Notre Dame now receives 3,500 truck loads of coal per year from a transloading facility six miles from campus. According to the petitioners, there is no evidence Notre Dame or anyone else is or will be interested in renewed rail service. Thus, they argued before the Board, the public interest favors abandonment so the City can construct a sewer system and a recreational trail through the right-of-way and the Brothers and the Sisters of the Holy Cross can exercise their reversionary interests in order to expand their campuses.

The Chicago, Lake Shore and South Bend Railway Company (CLS), a start-up short branch railroad, opposed the application. CLS hopes to buy the lines from NS and persuade Notre Dame to resume accepting coal by rail. NS took no position on the application but explained that, if the lines are not abandoned, rehabilitating them would be feasible.

The Board denied the petitioners' application on the ground that there is "a reasonable potential for future" use of the lines. *Norfolk S. Ry. Co.*, No. AB-290 (Sub-No. 286), 2008 WL 391303, slip op. at 3–4, 6–7 (Feb. 13, 2008) (*NS I*). The Board acknowledged that, according to an article in the *South Bend Tribune* put into the record by the petitioners, the Executive Vice-President of Notre Dame, John Affleck-Graves, said that opposition from the city government and neighborhood residents stood in the way of the University's "consider[ing] using rail service again for coal deliveries." *Id.* at 5 n.14. The Board, however, explained that the practice of transloading coal for daily shipments by truck would not make economic sense if CLS were to rehabilitate the lines to restore rail service to the plant. *Id.* at 4. The Board deemed the City's development projects, which could go forward without the lines being abandoned, and the Brothers' concern about the construction cost of rerouting a road in order to expand the campus, insufficient to outweigh the public interest in preserving the lines. *Id.* at 6–7. In sum, because (a) Notre Dame might in the future, "under appropriate circumstances," accept coal by rail, and (b) there was no substantial countervailing interest in immediate abandonment, the Board declined to "short-circuit" CLS's plan to restore rail service. *Id.* at 7. At the same time, the Board invited the

petitioners to renew their challenge if, after a "reasonable period of time," CLS was unable to restore operations. *Id.*[*]

Some weeks later the petitioners asked the Board to reopen the proceeding in light of a letter the Board had received from Affleck-Graves. The Board, with one member in dissent, denied the petition, concluding the letter presented no new information and the petitioners could have solicited a similar letter earlier. *See Norfolk S. Ry. Co.*, No. AB-290 (Sub-No. 286), 2008 WL 3971092, slip op. at 2–4 (Aug. 26, 2008) (*NS II*).

## II.  Analysis

We review the Board's denial of the petitioners' application under the highly deferential arbitrary-and-capricious standard of the APA. *See* 5 U.S.C. § 706(2)(A); *Cross Harbor*, 374 F.3d at 1181; *Burlington N. R.R. Co. v. STB*, 114 F.3d 206, 210 (D.C. Cir. 1997); *see also Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321 (1981) (Board's assessment of public convenience and necessity "entitled to considerable deference").  Here the Board correctly allocated the burden to the petitioners, *see Cross Harbor*, 374 F.3d at 1186, duly balanced the relevant interests, *see id.* at 1183, and reasonably determined that preserving the right-of-way for a time in order to serve potential future demand outweighed the petitioners' interest in immediate abandonment, *see Seminole Gulf Ry.*, No. AB-400 (Sub-No. 4), 2004 WL 2618630, at *4 (STB Nov. 17, 2004);

---

[*]  In a simultaneously issued order not here under review, the Board lifted a stay of CLS's notice of acquisition exemption, thereby freeing CLS to acquire the lines if NS decides to sell them.  *See* 49 C.F.R. § 1150.31.

*Salt Lake City Corp.*, No. AB-33 (Sub-No. 183), 2002 WL 368014, at \*6 (STB Mar. 6, 2002).[*]

The gravamen of the petition for review is that the record does not support the Board's finding "that there is a potential for renewed rail operations," *NS I*, slip op. at 4, because both Notre Dame's public statement and NS's submission indicate the University has no present interest in receiving coal by rail. The petitioners point to the statement of Affleck-Graves, as quoted in the *South Bend Tribune*, that "[n]ow and in the foreseeable future, we'll have our coal delivered by truck." It is the Board's undisputed judgment, however, that "[c]oal can generally be moved more efficiently by rail than by truck." *Id.* at 4 n.13. Notre Dame's historical practice of receiving coal by rail made economic sense, therefore. By implication, the University's current practice — receiving, on average, about 14 truck loads of coal every weekday — is not economically rational and will be even more inefficient when the University's annual demand goes from its current level of 80,000 tons to the 100,000 tons CLS projects, without contradiction, will be needed "in the near future." *See id.* at 4. CLS asserted, again without contradiction, that rail service would be cost-effective for Notre Dame's supplier.[**] *Id.*

---

[*] In supplemental briefing requested by the Court, CLS argued the Congress abrogated the Board's authority to require adverse abandonment when it revised the statute in 1995, but we can and do deny the petition for review without reaching that question. *See Mitchell v. Christopher*, 996 F.2d 375, 378 (D.C. Cir. 1993) ("A defect in an agency's jurisdiction, after all, does not affect the subject matter jurisdiction of the ... court").

[**] The petitioners argue the affidavit of CLS's president, in which this evidence appeared, is unworthy of consideration because the information was not confirmed by Notre Dame's supplier. The sworn statement was sufficiently reliable, however — especially in the absence of contradictory evidence — for the Board to take it

In the light of this evidence, the Board reasonably found Notre Dame "might be interested in again receiving coal shipments by rail directly to its power plant" if, as implied by the statement of Affleck-Graves recounted in the *South Bend Tribune*, political and social pressures diminish in the future.[*] *Id.* at 5 & n.14. The same article thus presented a plausible explanation — unchallenged by the petitioners — why the University has yet to resume an economically rational practice. In sum, the finding of the Board rests upon "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. FMC*, 383 U.S. 607, 620 (1966); *cf. EchoStar*, 292 F.3d at 753 (agency may consider reliable hearsay).

The petitioners also argue the Board's assessment of the evidence contravenes its precedent, which they imply forecloses finding substantial evidence of demand if no shipper has opposed the abandonment. Upon inspection, however, we see the Board's precedent requires it to treat shipper opposition *vel non* as but one factor in its decision. *Cf. Cross Harbor*, 374 F.3d at 1186 (Board generally denies application if there is evidence of "potential future shippers"); *CSX Corp. & CSX Transp.*, No. AB-31 (Sub-No. 38), 2002 WL 127074, at *5 (Jan. 28, 2002) (considering before approving adverse abandonment both whether any shipper

into account in determining whether there was substantial evidence of "a potential for renewed rail operations." *See EchoStar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002).

[*] The petitioners suggest the paraphrased statement cited by the agency was unreliable hearsay, but it was they who put the article into the record as evidence of Notre Dame's current position. Their change of position, which smacks of an attempt to "sandbag" the agency, will not be countenanced by the court. *Cf. USAir, Inc. v. DOT*, 969 F.2d 1256, 1260 (D.C. Cir. 1992).

had protested and whether shippers would "lose routing options").

Lastly in this regard, the petitioners argue the Board should have deferred to NS's "business judgment," *see Salt Lake City Corp.*, 2002 WL 368014, at *6 ("it would be inappropriate to substitute our judgment for [the carrier's] business judgment"), which they interpret to be that CLS's plan is infeasible and not based upon a realistic potential demand. As the Board read NS's submission, however, NS "state[d] that it would not be economically prohibitive to rehabilitate the [lines]." *NS I*, slip op. at 5. To be sure, NS had also stated that "it currently has no ... reason to sell" the lines to CLS because Notre Dame did not then support CLS's plan, Reply of NS at 8 n.6, *NS I*, but the Board reasonably inferred that NS would consider selling if Notre Dame changed its position, *see NS I*, slip op. at 5 (finding "record indicates" NS "withdrew from the sale initially" because Notre Dame "publicly withdrew its support"); *NS II*, slip op. at 2 (explaining that in *NS I*, Board "noted that [NS] remain[s] willing to sell the [lines] to [CLS]").

On the other side of the balance, the petitioners argue the Board underestimated the public interest in abandonment. In light of the Board's well-reasoned assessment of the potential for renewed service, however, we have no cause to disturb the Board's equally reasonable determination that the petitioners' interest in immediate abandonment did not outweigh the public interest in preserving the lines. *See NS I*, slip op. at 6–7; *see also Cross Harbor*, 374 F.3d at 1182 (Board generally denies application to abandon line with potential for future service); *W. Stock Show Ass'n*, 1 S.T.B. 113, 1996 WL 366394, at *12 (June 12, 1996) (same); *Chelsea Prop. Owners*, 8 I.C.C.2d 773, 778 (1992) (same).

In sum, by denying the petitioners' application and giving CLS a "reasonable period of time" to acquire the lines, invest in rehabilitating them, address local concerns, and pursue shippers such as Notre Dame or its supplier of coal, *NS I*, slip op. at 7, the Board acted reasonably in furtherance of its "statutory duty to preserve and promote continued rail service," *Cross Harbor,* 374 F.3d at 1187; *see Waterloo Ry. Co.*, No. AB-124 (Sub-No.2), 2004 WL 941227, at *3 (STB Apr. 30, 2004) (Board must protect public "against the unnecessary discontinuance, cessation, interruption, or obstruction of available rail service"). How long "a reasonable period of time" may be in this context we leave to the Board to decide in the first instance.

\* \* \*

The petitioners also challenge as arbitrary and capricious the Board's order denying their petition, based upon new evidence, to reopen the proceeding pursuant to 49 C.F.R. § 1115.4. *See ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 278 (1987) (denial of petition to reopen based upon new evidence reviewed under arbitrary-and-capricious standard); *Jost v. STB*, 194 F.3d 79, 85 (D.C. Cir. 1999) (same). The petitioners point to the letter the Board received from Affleck-Graves after issuing its opinion in this case.

The petitioners argue the Board should have reversed its position in light of the letter, which they claim shows Notre Dame has a firm intention not to resume receiving coal by rail. As the Board explained, however, the letter merely stated more emphatically what the article in the *South Bend Tribune* had quoted Affleck-Graves as saying: Notre Dame has no present plan to use the lines. *See NS II*, slip op. at 3–4. The Board reasonably concluded, therefore, the letter did not

require it to reverse its determination that there is a reasonable likelihood Notre Dame's plans will change. *Id.* at 4.[*]

### III.  Conclusion

Based upon the foregoing, the petitions for review are
*Denied.*

---

[*] We have considered and found unavailing the petitioners' remaining arguments, which are sufficiently lacking in merit as not to warrant consideration in a published opinion.

KAVANAUGH, *Circuit Judge*, concurring:[1]  I join the opinion of the Court and write separately to add two points.

I

First, the premise of the Court's opinion is that the relevant statute permits third parties such as the City of South Bend to file adverse abandonment petitions.  But as the owner of this railroad line has suggested, that premise may be inaccurate.  To be sure, the Surface Transportation Board or its predecessor, the Interstate Commerce Commission, has exercised adverse abandonment authority since 1981.  It appears, however, that the statute as amended by the ICC Termination Act of 1995 may allow only a railroad that owns the tracks – not a third party – to seek abandonment of a rail line.[2]  We need not address that important and difficult statutory issue in this case because South Bend loses regardless whether the statute still allows adverse abandonment.  But Congress and the Executive Branch would be well-advised to promptly clear up the statutory uncertainty created, perhaps inadvertently, by the 1995 Act.

---

[1] Chief Judge Sentelle joins Part I of this opinion.

[2] The language of section 10903(a)(1) of Title 49 seems to indicate that abandonment can occur only when the railroad files for it.  The provision reads:

> A rail carrier providing transportation subject to the jurisdiction of the Board under this part who intends to—
>> (A) abandon any part of its railroad lines; or
>> (B) discontinue the operation of all rail transportation over any part of its railroad lines,
> must file an application relating thereto with the Board. An abandonment or discontinuance may be carried out only as authorized under this chapter.

II

Second, assuming that third parties may file adverse abandonment petitions, the Board's decision to deny the City of South Bend's petition in this case barely passes muster – and does so only because of the significant deference we owe the Board under the arbitrary and capricious test. Our deference in applying the arbitrary and capricious standard has limits, however, and the Board's action in this case is bumping up against them. This dormant railroad track has been a useless eyesore in South Bend for well over a decade. Measured against the relevant adverse abandonment precedents, the Board's authority to continue denying South Bend's plea is nearly at an end. In my judgment, if sale of this inactive line does not occur by the end of 2010, the "reasonable period of time" allotted by the Board likely will have expired. *Norfolk S. Ry. Co.*, STB No. AB-290 (Sub-No. 286), slip op. at 7, 2008 WL 391303 (Feb. 13, 2008); *see Modern Handcraft, Inc.*, 363 I.C.C. 969, 972 (1981) (adverse abandonment when line unused for 12 years); *see also Consol. Rail Corp. v. ICC*, 29 F.3d 706, 709-10 (D.C. Cir. 1994) (adverse abandonment when line unused for about 20 years); *Denver & Rio Grande Ry. Historical Found.*, STB No. AB-1014, slip op. at 1, 2008 WL 2154898 (May 21, 2008) (same).